Billings, Thomas P., J.
For the reasons that follow, the Defendants’ Motion to Dismiss is ALLOWED IN PART and DENIED IN PART, as more fully set out in the Order below.
FACTS
This is a dispute between a borrower/mortgagor and the lender and servicing company which made and have serviced (respectively) her mortgage loan. The Complaint is in ten counts, as follows:
1. Fraud;
2. Negligence;
3. Chapter 93A;
4. Breach of Contract;
5. Unjust Enrichment;
6. Truth in Lending Act;
7. Home Ownership and Equity Protection Act;
8. Real Estate Settlement Procedures Act;
9. Massachusetts Consumer Credit Cost Disclosure Act; and
10. Intentional and Negligent Infliction of Emotional Distress.
According to the Complaint, whose allegations are taken as true for purposes of this Motion, the plaintiff in 2007 granted first and second mortgages on her home at 172 Middle Street, Apt. 107, Lowell to Bank of America (the “Bank”). She paid the loans on time for the first twenty-four months. As the economy worsened, however, she anticipated difficulty in making payments, and so called the defendants for advice. The defendants told her that because the loan was not in default they could not help her, and that she would have to cease payments if she wanted their assistance.
At some point, the defendants began participating in the federal Home Affordable Modification Program (“HAMP”). The plaintiff applied for modification assistance via HAMP, but the process proved frustrating: the defendants repeatedly lost her paperwork; she had *195 to submit and re-submit documents; and she spent hours at a time on hold, waiting to speak with a human being. She did, however, receive the defendants’ verbal assurance that she was “pre-qualified” for the HAMP program and that confirmatoiy paperwork would be forthcoming. This was reiterated in a letter in July 2010, which indicated that she was qualified and promised further paperwork to complete the process. It never happened.
In sum, the defendants “have serially delayed and obstructed the Plaintiffs efforts at modification to pad their revenues and protect their financial interest to the detriment of Plaintiff in violation of the federal mandates included with Defendants’ acceptance of Troubled Asset Relief Program (“TARP”)” funding. The Complaint posits several forms of financial advantage that she infers the defendants have sought to realize by delaying and denying modification.[2] By the time of the Complaint, the defendants had instituted a “nonjudicial foreclosure action” against the plaintiff. This presumably refers to an action brought to comply with the Servicemembers’ Relief Act. See 50 U.S.C. App. §§501 et seq., implemented in Massachusetts by the Acts of 1943, c. 57, reprinted after G.L.c. 244, §14.
With her opposition to the defendants’ Motion to Dismiss, the plaintiff submitted an affidavit. This provides considerably more detail than the Complaint concerning her dealings with the Bank from October 2009, when she first contacted it about a loan modification, through the latter part of 2010. The affidavit is further discussed below, insofar as it is relevant to this Motion.
DISCUSSION
1. Standard of Review.
When evaluating the legal sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the Court accepts as true all factual allegations in the complaint, and draws all reasonable inferences in favor of the plaintiff. Berish v. Bornstein, 437 Mass. 252, 267 (2002). The Court’s review is ordinarily limited to the four corners of the Complaint, see Reliance Ins. Co. v. Boston, 71 Mass.App.Ct. 550, 554-55 (2008), supplemented where appropriate by resort to documents attached to or referenced in the Complaint, and matters of public record. Schaer v. Brandeis University, 432 Mass. 474, 477 (2000); Harhen v. Brown, 431 Mass. 838, 840 (2000).[3]
The Complaint in this case displays a persistent and unfortunate disregard for the pleading standard articulated in Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-36 (2008). In Iannacchino, the SJC shadowed the evolution of federal law[4] and abandoned the old “no set of facts” rule of Nader v. Citron[5] to require more rigorous and informative pleading. Although the allegations of the Complaint are still taken as true (as under the old Nader rule), they are now to be examined for “heft.”
“While a complaint attacked by a . . . motion to dismiss does not need detailed factual allegations ... a plaintiffs obligation to provide the ‘grounds’ of his ‘entitle(ment) to relief requires more than labels and conclusions . . . Factual allegations must be enough to raise a right to relief above the speculative level... [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ...” What is required at the pleading stage are factual “allegations plausibly suggesting (not merely consistent with)” an entitlement to relief, in order to “reflect! ) the threshold requirement of [Rule] 8(a)(2) that the ‘plain statement’ possess enough heft to ‘shofw] that the pleader is entitled to relief.’ ”
Iannacchino, 451 Mass. at 636, quoting Twombly, 550 U.S. at 555-57.
Every Count in the Complaint in this case, if confined within its four corners, would fail the Iannacchino test. As noted above, however, the plaintiff filed an affidavit with her opposition to the motion to dismiss. This brings into play the penultimate sentence of Rule 12(b):
If, on any motion asserting the defense numbered (6), to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
The motion has been argued and taken under advisement without either side or (regrettably) the Court explicitly invoking this aspect of the Rule, or discussing the appropriate procedure for giving the parties an appropriate opportunity to submit summary judgment materials. Such concerns are less pressing, however, when (as here) it is the plaintiff/opponent who has expanded upon the materials normally reviewable under Rule 12. This is because the assertions in her affidavit are essentially irrebuttable for purposes of the motion, whether considered under Rule 12 or Rule 56. Compare Berish, supra, with Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202, 203 (1991) (court considering defendant’s summary judgment motion is to “resolve any conflicts in the summary judgment materials, and . .. make all logically permissible inferences, in the plaintiffs favor”). I have therefore, in the discussion below of each Count, considered the allegations of the plaintiffs affidavit as if they had been (as they should have been) included within her Complaint.
I turn, then, to the ten Counts of the Complaint. Because the disposition of Count 2 (Negligence) depends in part on Count 4 (Breach of Contract), I have rearranged the order somewhat in this discussion from that in the Complaint.
*196 1. Count One: Fraud
To the factual rendition summarized above, Count One adds only conclusoiy allegations that the defendants have made false statements of material fact on which the plaintiff has relied to her detriment. This falls short of the pleading requirements for any sort of claim under Iannacchino, let alone the particularity requirement imposed by Mass.R.Civ.P. 9(b) for a fraud claim.
In her affidavit, however, the plaintiff has chronicled her communications with the defendants in substantially greater detail, including exact or approximate dates and a summary of what was said in each. Paragraph 4 is as follows:
In October of 2009, I contacted Bank of America due to economic hardship and divorce to arrange a reduced payment plan and a modification of the loan. I was told to stop paying the mortgage in order to be qualified for a program that could help me. I wanted to find a way to avoid being assessed late penalties and wanted to preserve my excellent credit.
Thereafter, the affidavit avers (again, with dates and other specifics) that she sought advice from a community agency, then submitted materials to the Bank in support of a loan modification. She became unable to continue paying the loan in December 2009, but was assured of help by the Bank, only to be told later that no program to help her existed.
At some point in the first half of 2010, the Bank implemented a loan modification program under HAMP. Although it told the plaintiff on July 3, 2010 that she qualified for relief, the Bank never sent her the forms and repeatedly lost her paperwork, demanding more paperwork, which she provided, and which the Bank again misplaced. It made false and/or broken promises of relief, and gave conflicting messages concerning whether she should make loan payments in the meantime and in what amount. Finally, the Complaint alleges in paragraph 5, the Bank commenced foreclosure proceedings.[6]
These averments are sufficient to make out a claim for fraud. See, e.g., McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 (1990) (“statements of present intention as to future conduct may be the basis for a fraud action if. . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage”); Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722 (1974), S.C., 368 Mass. 811 (1975) (“Although as a general rule representations as to future events are not actionable, an exception has been recognized ‘where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate’ ” (citations omitted). The Motion to Dismiss is therefore denied as to Count One.
2. Count Four: Breach of Contract
Count Four pleads two separate contract theories: (a) that by failing to comply with federal HAMP guidelines the defendants breached their contracts with the plaintiff for mortgage servicing and/or lending and the covenant of good faith and fair dealing implied therein, and (b) that the plaintiff is a third-party beneficiary of the defendant’s contract with the federal government under the HAMP program, which contract the defendants have breached.
Neither the Complaint nor the affidavit attaches, or recites any terms of, the alleged contracts between the plaintiff and either defendant. It seems doubtful that she had a contract with BAC, since loan servicers generally contract with the lender rather than the borrower, and it seems equally doubtful that her contract with the Bank in 2007 said anything about the HAMP program, which did not yet exist. Nor do the loan documents included with the defendants’ papers provide any support for this claim. So much of Count Four as alleges a first-party claim for breach of contract is accordingly dismissed.
The plaintiffs third-parfy beneficiary theory requires more extended discussion, and a fair amount of permissible judicial notice. The subprime lending disaster and resulting financial meltdown prompted Congress to enact, and President Bush to sign, the Emergency Economic Stabilization Act of 2008.[7] The Act’s centerpiece was the creation of the $700 billion Troubled Asset Relief Program (‘TARP’j, and a new Office of Financial Stability to oversee it. Bank of America was in the first group of nine large banks to accept TARP funds, nine days after the Act was signed into law.[8]
The Act directed the Secretary of the Treasury (among other tasks) to “implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program ... or other available programs to minimize foreclosures.” Pub. L. No. 110-343 (2008), §§101, 109. The details were left entirely up to the Secretary.
Of this legislation and subsequent executive action, HAMP was born.
To deal with investor and servicer disincentives to modify home mortgages, the Obama Administration announced details of the Making Home Affordable Program (MHA) on March 4, 2009, including the Home Affordable Modification Program (HAMP) with a goal “to [r]each [u]p to 3 to 4 [million [a]t-[r]isk (h)omeowners.”
Braucher, “Humpty Dumpty and the Foreclosure Crisis: Lessons from the Lackluster First Year of the Home Affordable Modification Program (HAMP)” (September 09, 2010), 52 Ariz.L.Rev. 727, 748 (2010)[9] (footnotes omitted).
The largest of the MHA initiatives, HAMP provides for modification of first-lien mortgage loans originated *197 on or before January 1, 2009, secured by a one-to-four-unit property that is or includes the owner’s principal residence, with a specified maximum loan balance ($729,750 for single-unit properties). Id. at 748-49. In a federal colleague’s helpful summary,
Among other things, HAMP creates a cost sharing system, whereby the government helps reduce the impact of mortgage modifications on lenders. In exchange, the program asks servicers to standardize and systemize a process for mortgage modification, including the implementation of the net present value (NPV) test. NPV compares the expected cash flow from a modified loan with the cash flow from the unmodified loan. If the expected cash flow from the modified loan exceeds the amount from the unmodified loan, then the loan servicer must modify the loan. In considering a loan for modification, servicers must perform a “Standard Modification Waterfall.” This process requires servicers to apply a series of modification steps that work to reduce loan monthly payments to as close as possible to 31 percent of the homeowners gross monthly income.
Servicers opt into HAMP by executing Servicer Participation Agreements (SPAs). These agreements between servicers and Fannie Mae, in its capacity as a financial agent for the United States, require servicers to consider all eligible mortgage loans for modification unless prohibited by the rules of an application pooling and servicing agreement (PSA), which establish private label securitizations of mortgages. But even in the face of PSAs that prohibit modification, “(pjarticipating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out any modification under HAMP.”
Alpino v. JPMorgan Chase Bank, National Ass’n, 1:10-12040-PBS, 2011 WL 1564114 (D.Mass. April 21, 2011; Saris, U.S.D.J.), slip op. at 4-5 (citations omitted). It is evidently under the SPA between the federal government and the Bank and/or BAC that the plaintiff in this case claims third-party beneficiary status.
Servicers who elect to participate in HAMP commit to provide “(a]ll services required to be performed by a participating servicer as set forth in the Program Documentation for the Home Affordable Modification Program.” SPA standard form, 111(A) and Service Schedule A, p. A-l.[10] The program documentation imposes precise and exacting requirements on participating servicers. The servicer must screen for HAMP eligibility all first mortgage loans in its portfolio on which two or more payments are due and payable, then must take specific steps to “proactively solicit” any apparently HAMP-eligible borrower for participation. Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages (“Servicer handbook”),[11] Ch. II, ¶¶2.2-2.2.3. It must “have written procedures and personnel in place to provide timely and appropriate responses to borrower inquiries and complaints,” and to “escalate disagreements to a su-pervisoiy level.” Id., ¶2.1 at 54. There are detailed requirements for notices to borrowers who have been denied aTPP (trial period plan)[12] or loan modification, or who are at risk of losing eligibility due to inadequate documentation. ¶¶2.3.1 -2.3.5.
Inertia is not an option. “Servicers must acknowledge receipt of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice), a TPP Notice or a Non-Approval Notice.” Id., ¶2.2.2 (cross-references omitted). A participating servicer may not foreclose unless the borrower has been evaluated for HAMP relief and determined ineligible, or has been offered a TPP but failed to make the payments required under it, or has not responded to the solicitations required of the servicer, or has declined participation in the program. Id., ¶3.1. If a borrower whose loan has already been referred for foreclosure requests HAMP consideration, “the servicer must, immediately upon the borrower’s acceptance of aTPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process.” Id., ¶3.2. Even a previously scheduled foreclosure sale must be suspended if the borrower submits a request for HAMP consideration at least seven days before the sale date, unless the borrower has already been evaluated and determined to be ineligible, or was previously offered and breached the terms of a TPP or permanent loan modification. Id., ¶3.3.
Unfortunately, HAMP has thus far fallen well short of expectations. Although Congress offered “$75 billion in incentives to loan investors, servicers, and homeowners to try to get them to enter into more mortgage modifications, with a goal of reaching three to four million struggling borrowers,” the program’s first year saw only 230,801 permanent modifications. Braucher, supra, at 729 (footnotes omitted). By January 2011, nearly 1.8 million borrowers had been offered trial modifications and nearly 1.5 million had begun them, but half of these were canceled, and only 539,000 were in active permanent modifications. GAO-11-476T, “Troubled Asset Relief Program, Status of Programs and Implementation of GAO Recommendations (March 17, 2011), p. 13.[13]
The United States Government Accountability Office examined the problem and determined that its origins lay partly in Treasury’s year-long delay in issuing guidelines for servicer solicitation of HAMP-el-igible borrowers, and partly in gaps in the guidelines that were issued, which have led to inconsistent performance by servicers in performance of their obligations and a lack of robust quality assurance programs both among servicers and at Treasury. GAO-10-634, “Troubled Asset Relief Program, Further Actions Needed to Fully and Equitably Implement Foreclosure *198 Mitigation Programs” (June 2010), pp. 14-27.[14] The GAO also identified the lack of administrative enforcement mechanisms as a significant flaw in HAMP:
Treasury has taken some steps to ensure that servic-ers comply with HAMP program requirements, including those related to the treatment of borrowers, but has yet to establish specific consequences or penalties for noncompliance with HAMP guidelines . . . Without standardized remedies for noncompliance, Treasury risks inconsistent treatment of ser-vicer noncompliance and lacks transparency with respect to the severity of the steps it will take for specific types of noncompliance. (Id. at 27.)
What, then, of the plaintiffs claim to be a third-party beneficiaiy of the SPA between the defendants and the federal government? An early (in HAMP jurisprudence) federal case deemed this a viable cause of action. Marques v. Wells Fargo Home Mortgage, Inc., 09-1985-L, 2010 WL 3212131 (S.D.Cal. Aug. 12, 2010), slip op. at 4-10. Since then, however, eveiy court in the District of Massachusetts (and as far as I know, elsewhere) to consider the issue has rejected the Marques holding.[15] See Alpino at 7-11; Markle v. HSBC Mortgage Corp. (USA), 10-40189-FDS (D.Mass. July 12, 2011; Saylor, U.S.D.J.), and cases cited at slip op. 12-13; In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation, 2011 WL 2638222, *3 (D.Mass. July 6, 2011; Zobel, U.S.D.J.); Blackwood v. Wells Fargo Bank, N.A., 10-10483-JGD, 2011 WL 1561024 (D.Mass. April 22, 2011; Dein, U.S.M.J.); Brown v. Bank of America Corp., 10-11085-GAO, 2011 WL 1311278 (D.Mass. March 31, 2011; O'Toole, U.S.D.J.); Speleos v. BAC Home Loans Servicing, L.P., 755 F.Sup.2d 304 (D.Mass. 2010; Gorton, U.S.D.J.). This has also been the consensus in the decisions of this Court of which I am aware. See Barrasso v. Litton Loan Servicing, LP, Essex Superior Court No, 10-2103 (March 25, 2011; Welch, J.), slip op. at 4-5 and cases cited.
With the utmost respect for those in the majority, I believe nonetheless that the court in Marques had it right.
Whether state or federal law governs the inteipretation and application of a contract to which a federal agency is a party “is a matter of some disagreement among the federal courts.” Markle, slip op. at 8 and cases cited. The SJC, twenty-two years ago, ruled that state law governed whether a federal government contract should be construed to allow suit by a third-party ben-eficiaiy. Ayala v. Boston Hous. Auth., 404 Mass. 689, 702 n.14 (1989). The United States Supreme Court earlier this year addressed the issue of third-party enforceability, seemingly as a matter of federal common law, but without explicitly ruling that federal law controlled. Astra USA, Inc. v. Santa Clara County, 131 S.Ct. 1342 (2011). In fact, the choice-of-law issue in the present case may be resolved in the SPA itself, the current standard form of which (at 9111(A)) provides that federal law controls; but the SPA actually executed in this case is not part of the pleadings or otherwise in the record.
Federal and Massachusetts law are not, however, greatly dissimilar on the question of when a contract confers rights on non-parties. To enforce the contract, the plaintiff must be an “intended beneficiaiy.”
Unless otherwise agreed between promisor and prom-isee, a beneficiaiy of a promise is an intended benefi-ciaiy if recognition of a right to performance in the beneficiaiy is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiaiy; or (b) the circumstances indicate that the promisee intends to give the benefi-ciaiy the benefit of the promised performance.
Ayala at 699 n.13, quoting Restatement (Second) of Contracts §302(1) (1981); accord, Pharmaceutical Research and Mfrs. of America, Inc. v. Walsh, 538 U.S. 644, 683 (2003). It seems undeniable that the performance required of servicers who entered into SPAs was intended for the direct benefit of borrowers struggling to pay first mortgages on their residences, with the hope of additional but incidental benefits accruing to the economy as a whole.
As the Astra USA court underscored, however, contracts with governmental entities present special considerations. The expectation that government will act for the benefit of its citizens does not always mean that a citizen may sue to enforce a government contract to which s/he is not a party, even if s/he is among those benefitted by it. 131 S.Ct. at 1348 (“[t]he distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the prom-isee is a governmental entity,” quoting 9 J. Murray, Corbin on Contracts 9145.6, p. 92 (rev. ed. 2007); see Marques, slip op. at 5 (“[pjarties that benefit from a government contract are generally assumed to be incidental beneficiaries rather than intended ones, and so may not enforce the contract absent a clear intent to the contraryquoting County of Santa Clara v. Astra USA, Inc., 588 F.3d 1237, 1244 (9th Cir. 2009), rev’d on other grounds, 131 S.Ct. 1342 (2011)).
In Astra USA, the Supreme Court considered whether county-operated public hospitals and community healthcare facilities could enforce legal price ceilings on pharmaceuticals sold to them. The ceilings were imposed by Congress in section 340B of the Public Health Services Act (“PHSA”), 42 U.S.C. §256b, and embodied in a Pharmaceutical Pricing Agreement (“PPA”) between the Secretary of Health and Human Services and a pharmaceutical manufacturer. In holding that “340B entities” had no such right, the court pointed to several indicators that they were not intended beneficiaries of PPAs. One was that Congress did not provide an express private right of action under the PHSA. Another was that the PPA was a non-nego *199 tiated standard form which merely embodied the complex mandatory pricing formula of the statute.
Most tellingly, however, the PHSA and regulations under it provide a system of administrative adjudicatory proceedings and remedies (including fines, compensation to aggrieved providers, and/or termination of the PPA) for claims of overpricing. Judicial review of these proceedings is available under the Administrative Procedures Act. Allowing parallel suits by healthcare providers against drug companies, the court felt, would run contrary to this system of consistent adjudication and centralized enforcement, and “would undermine the agency’s efforts to administer both Medicaid and §340B harmoniously and on a uniform, nationwide basis.” 131 S.Ct. at_. Finally, the fact that the PHSA prohibited HHS from disclosing drug pricing information — "the very information necessary [for potential plaintiffs] to determine whether their asserted rights had been violated" — further underscored the Congressional intent limit enforcement to the administrative procedure it had provided.
Like the PPA implementing the PHSA’s pricing controls, the HAMP program’s SPAs are modeled on a standard form. There, however, the similarity between the two programs largely ends. As noted above, Congress did not create or define HAMP; rather, it directed Treasury to develop a plan to promote mortgage modifications, and provided funding. Neither the enabling legislation, nor the HAMP guidelines, nor the SPA provides any internal or external mechanism for adjudicating disputes over whether the servicer has complied with its obligations to solicit borrowers for HAMP participation, take timely action on their requests for loan modification, provide relief if they qualify, and stay foreclosure activity in the meantime. In short: there is no risk of a judicial proceeding such as this one duplicating or undermining a parallel administrative enforcement system, because no such system exists.[16]
Several courts which denied borrowers’ third-party beneficiary claims have pointed to paragraph 11(E) of the SPA standard form, which provides that the agreement “shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.” From the fact that borrowers are not mentioned in this clause, these courts have concluded that they could not be intended beneficiaries of the contract. See, e.g., Markle, slip op. at 11; Speleos, slip op. at 12. Respectfully, I disagree. Particularly when viewed against the backdrop of three decades that saw medium-sized banks acquiring small banks, only to be taken over by larger banks, which were then absorbed into megabanks, it is apparent that paragraph 11(E) is just a straightforward successor clause,[17] to be taken at face value and no more.
Beyond this, there is nothing in the standard-form SPA to suggest that borrowers — who were obviously and primarily intended to benefit from the contractual commitments made by servicers in exchange for their receipt of billions of TARP dollars — should not be allowed to enforce those commitments. They have no other forum in which their claims may be heard and adjudicated. Denial of third-party beneficiary status to persons aggrieved by violations such as are alleged here would be — borrowing the words of the SJC when considering a different claim by beneficiaries of a federal government contract — to “mock the very goals of’ the program that the contract was intended to further, placing its “legitimacy ... in grave doubt.” Ayala, 404 Mass. at 700-02 (citation omitted).
There remains the question of whether this borrower has adequately pleaded a violation of the SPA. The Complaint does not reference the SPA specifically, or recite any of its terms, much less identify what conduct is alleged to have violated which term. Nonetheless, there is enough in the affidavit, ¶¶ 17-24, to make out a claim. The plaintiff avers that after a lengthy period of lost and repeatedly re-submitted paperwork, she was informed on July 6, 2010 that she qualified for HAMP relief, underwent a lengthy financial audit over the telephone, and was promised follow-up documentation and a halt to further collection and foreclosure efforts. The Bank never sent the promised documentation, however, and refused to approve a TPP. Lengthy and repeated telephone calls in August produced no documents, no approval, and no progress. Finally, on September 3 the plaintiff was told there was no record of her having qualified for the program. She requested and was given the opportuniiy to reapply, but the documentation still never came. All while the collection calls continued and the late fees kept mounting, and the loan was at some point placed in foreclosure.[18] This is enough to make out a claim for violation of the SPA, and resulting damage to the plaintiff. The motion to dismiss is therefore denied as to the third-party beneficiary claim in Count 4.
3. Count Two: Negligence
Count 2 alleges that the defendants “had an affirmative duty to treat the Plaintiffs [sic] in good faith while following all State and Federal Consumer Protection Laws and to negotiate in a commercially reasonable manner,” but breached these duties “in the handling of their mortgage loan, payments, and by their misrepresentations and omissions regarding and throughout the modification process.” As with Counts One and Four, Count Two does not point to any conduct or statements in particular, or otherwise expand on the very general averments of the body of the Complaint, but the affidavit largely fills in the gaps, and sets out facts (summarized above in the discussion of Count Four) from which one could conclude that the defendants were negligent in the performance of their duties under HAMP and the SAP.
“[0]ne who assumes a duty under contract ‘is liable to third persons not parties to the contract who are foreseeably exposed to danger and injured as a result of its negligent failure to cany out that obligation.’ . . . However, failure to perform a contractual obligation is *200 not a tort in the absence of a duty to act apart from the promise made.” Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 367-68 (1997) (citation omitted). Similarly, violation of a statute, ordinance, regulation or industry standard is evidence of negligence as to consequences that the enactment was intended to prevent, Matteo v. Livingstone, 40 Mass.App.Ct. 658, 659 (1996), but “does not create a duty in a plaintiff where one does not exist independently.” Goulart v. Canton Hous. Auth., 57 Mass.App.Ct. 440, 444 (2003).
Because the plaintiff has contract enforcement rights as a third-party beneficiary,[19] she may assert a claim for negligent performance of the duties imposed by the SPA and the administrative directives which it incorporates. The motion to dismiss is therefore denied as to Count Two.
4.Count Three: Chapter 93A
Count Three alleges “various unfair and deceptive practices throughout the [defendants’] handling and servicing of the Plaintiffs mortgage loan,” but gives no specifics as to what these might have been. Nor do the allegations in the body of the complaint- — that the defendants said they could not consider modification of a performing loan, were unresponsive to her communications thereafter, and have put the loan into foreclosure — provide the necessary “heft.” Count 3, while it might have scraped by under the old Nader v. Citron standard, fails under Iannacchino.
The affidavit goes part of the way toward rescuing Count Three, but not all the way. Having alleged conduct that amounted to intentional misrepresentations and also violated administrative directives intended for her protection, the plaintiff has made out a violation of Chapter 93A. See Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 777 (1980) (“[a] practice may be ‘deceptive’ if it ‘could reasonably be found to have caused a person to act differently from the way he otherwise would have acted’ ” (citation omitted)); 940 C.M.R. ¶3.16(4) (conductviolates Chapter 93A if it “violates . . . Federal consumer protection statutes within the purview of M.G.L.c. 93A, ¶2”); American Shooting Sports Council Inc. v. Attorney Gen., 429 Mass. 871, 880 & n. 15 (1999).[20]
Neither the Complaint nor the affidavit alleges, however, that the plaintiff has fulfilled the demand letter requirement of G.L.c. 93A, ¶9. The Complaint attempts to skirt this requirement by characterizing this action as a “counter-claim in defense to the Defendant’s foreclosure action.”[21] The term “counterclaim,” however, is one of art, with a precise meaning. See Mass.RCiv.P. 13. The Bank merely sought in its “foreclosure action” to comply with the Servicemembers’ Relief Act. As such, the proceeding was limited to ascertainment of the existence and rights of affected members of the armed forces, and no counterclaim of the sort asserted here would lie. Beaton v. Justices of the Land Court, 367 Mass. 385 (1975).
This is a new case, in which the plaintiff took the offensive. It was therefore incumbent upon her to serve the requisite demand letter at least thirty days before asserting her claim under Chapter 93A, whether originally or by way of an amended complaint. See Tarpey v. Crescent Ridge Dairy, Inc., 47 Mass.App.Ct. 380, 391-92 (1999). Count Three will therefore be dismissed, without prejudice to a motion to amend should it later appear that the demand requirement has been satisfied.
5.Count Five: Unjust Enrichment
Count 5 alleges that the defendants “by fraud, accident, mistake, coercion or trick have collected thousands of dollars from the Plaintiff,” and have erroneously applied the money “to various alleged costs and fees of their own creation rather than to principle [sic] and interest as required.” The affidavit avers that while the defendants were fumbling her requests for HAMP relief, she was receiving “continuous calls . . . demanding payment, stating I was delinquent, and adding fees.”
Missing from both the Complaint and the affidavit is any suggestion that the defendants have in fact been enriched at the plaintiffs expense. It does not appear that the foreclosure sale has gone forward, or that the plaintiff has paid any of the fees allegedly charged improperly to her loan account.[22] In her opposition, she argues that the defendants have been unjustly enriched by their receipt of TARP funds. Although the general point is the subject of lively and good-faith debate as a matter of politics and policy,[23] it does not amount to a claim under which she may recover. Count Five will therefore be dismissed.
6.Truth in Lending Act
Count Six contains only a cite to the federal Truth in Lending Act and its requirement of “full and accurate disclosure of all consumer credit terms,” an averment that “(t]he Defendants, their agents, or assignees, did not comply with these requirements under the law,” and a recitation of the statutory consequences. The affidavit says nothing about the disclosures in the lending process.
The additional documents provided by the defendants (including the Truth in Lending Disclosure Statements for both loans) contain no obvious deficiencies; nor has the plaintiff, in her opposition, identified any. In fact, her sole response to the motion to dismiss the statutory counts — Six through Nine — is a request that action be stayed “pending further investigation.” This does not, of course, satisfy either the pleading standard of Iannacchino or counsel’s obligation under Mass.RCiv.P. 11(a). Count Six, too, will be dismissed.
7.Home Ownership and Equity Protection Act
Count 7 resembles Count Six, in that it cites a federal statute, states that it “provides additional protections to the Plaintiffs” [sic], and alleges that the defendants violated the statute by “[f]ailure to provide *201 three day advanced look disclosures” and by “(c]hanging terms at the last minute,” without further factual embellishment in the Complaint or in the affidavit.
HOEPA imposes disclosure requirements for certain high-cost, non-purchase-money residential mortgage loans — those with an APR at consummation more than ten percent higher than the yield on Treasury securities with comparable maturity, or total points and fees exceeding the greater of $400 or 8% of the loan amount. 12 U.S.C. §§1602(aa), 1639; 12 CFR 226.32. As is apparent from the documents supplied with the defendants’ papers, neither loan at issue in this case came anywhere close to meeting either of HOEPA’s cost criteria. Count Seven will therefore be dismissed.
8.Real Estate Settlement Procedures Act
The defendants violated RESPA, says Count Eight, in that “(cjertain required notices and disclosures were either not provided, misdated, misdirected, or ignored,” to the plaintiffs detriment. Like the truth-in-lending disclosures, the good-faith estimates of closing costs and the final RESPA statements for both loans are included with defendants’ motion papers, but the plaintiff has not identified any defects in either. There being no factual allegations “suggesting ... an entitlement to relief,” Count Eight will be dismissed.
9.Massachusetts Consumer Credit Cost Disclosure Act
Count Nine follows the pattern of the preceding three: a statute is pulled out of the hat and a violation alleged, without any suggestion of the factual basis in either the Complaint or the affidavit. Count Nine will be dismissed.
10.Intentional or Negligent Infliction of Emotional Distress
Count Ten labels the defendants’ conduct extreme and outrageous and/or negligent, recites that the plaintiff has experienced emotional distress with accompanying physical symptoms, and prays for damages. The affidavit provides considerably greater detail with respect to the Bank’s conduct, and somewhat greater detail concerning the plaintiffs resulting distress and attendant symptomatology. Both fail, however, to allege facts suggesting an entitlement to relief under either theory pleaded in Count Ten.
The plaintiff in a claim for intentional infliction of emotional distress
must establish “(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant’s conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiffs distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.” Liability cannot be predicated on “ ‘mere insults, indignities, threats, annoyances, petty oppressions or other trivialities’ nor even is it enough ‘that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by ’’malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.’ “
Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997), quoting Payton v. Abbott Labs, 386 Mass. 540, 555 (1982); Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987); and Restatement (Second) of Torts §46 comment d (1965), and citing Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1976).
Dealing with a large financial institution can be enormously frustrating at times, and is doubtless especially distressing if one’s home is at stake. The conduct alleged in the Complaint and the affidavit was not, however, so “extreme and outrageous,” so “profoundly shocking” (Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994)), as to be actionable as intentional infliction of emotional distress.[24] As the Appeals Court has commented:
“Outrageous” is a word somewhat debased in current usage, but as employed in the Agis opinion it meant more than workaday insults, annoyances, or even threats and petty oppressions. It means, for example, a high order of reckless ruthlessness or deliberate malevolence that, as the Agis and Foley opinions say, is simply intolerable.
Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994). The defendants’ alleged conduct did not rise (or sink) to this level.
Nor does the Complaint make out a claim for negligent infliction.
[Massachusetts] decisional law permits certain persons to recover damages in tort for emotional distress resulting from an injury to a third party. For the most part, the class of persons allowed such recovery has been limited to “[a] parent of or another person closely related to a third person directly injured by the tortfeasor’s conduct.”
****
Among the pragmatic judgments applied to claims of emotional distress are those imposing requirements of spatial and temporal proximity upon plaintiffs. Recovery has been limited to those plaintiffs who witness the injury or come upon the injured party at the scene of the injury or immediately after the infliction of the injury.
Krasnecky v. Meffen, 56 Mass.App.Ct. 418, 421-22 (2002). Departures from this paradigmatic fact pattern have been rare. Compare Migliori v. Airborne Freight Corp., 426 Mass. 629 (1998) (witness to stranger’s fatal accident denied recovery), with Sullivan v. Boston Gas Co., 414 Mass. 129 (1993) (witness to accidental destruction of his home in gas explosion *202 permitted recovery). No reported case of which I am aware has suggested that recovery might be permitted on facts such as those alleged here. Count Ten will therefore be dismissed in its entirely.
ORDER
For the foregoing reasons, the defendants’ Motion to Dismiss is ALLOWED IN PART and DENIED IN PART. Counts Five, Six, Seven, Eight, Nine and Ten, and so much of Count One as alleges breach of a contract between the plaintiff and the defendants directly, are dismissed; the remaining claims may proceed.

The list, which need not be reproduced here, is derived from an article titled “Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior,” available on the website of the National Consumer Law Center at: www.nclc.org/images/pdf/pr-reports/report-servicers-mo dify.pdf.

Thus, the defendants have properly included with their motion copies of loan and closing documents referenced, albeit very generally, in the Complaint in connection with certain of the plaintiffs statutory claims.

See Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), whose holding under Fed.R.Civ.P. 12(b)(6) the Iannacchino decision adopted for proceedings under the cognate Massachusetts rule.

 372 Mass. 96, 98 (1977) (“In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,” quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which the Supreme Court later overruled in Bell Atlantic v. Twombly.)

Both the Complaint and the affidavit are vague concerning which defendant did what; generally, references are to “the defendants” or “the Bank.”

Pub. L. No. 110-343 (2008) (later amended Pub. L. No. 111-5, §7002 (2009)).

“U.S. Investing $250 Billion in Banks,” New York Times, October 13, 2008, available at: http://www.nytimes.com/ 2008/10/14/business/economy/14treasuiy.html?adxnnl =1 &adxnnlx=1323809410-xlQfObhPhj r54LsKh2HFcg.

Available at: http://www.arizonalawreview.org/pdf/52-3/52arizlrev727.pdf.

The form is available at: https://www.hmpadmin.com/ portal/programs/docs/hamp_servicer/servicerparticipatio nagreement.pdf.

 Available at: https://www.hmpadmin.com/portal/pro-grams/docs/hamp_servicer/mhahandbook_33.pdf.

For most borrowers, implementation and successful completion of the TPP is the first step toward a permanent loan modification. See Servicer Handbook, Ch. II, ¶4.6.

Available at: http://www.gao.gov/new.items/ dll476t.pdf.

Available at: http://www.gao.gov/new.items/ dl0634.pdf.

To be distinguished are those cases upholding a first-party claim for breach of contract, where the lender or servicing agent is alleged to have breached a contract entered into with the borrower under the HAMP program (for example, a TPP). E.g., Bosque v. Wells Fargo Bank, 762 F.Sup.2d 342 (D.Mass. 2011; Saylor, U.S.D.J.); Belyea v. Litton Loan Servicing, LLP, 10-10931-DJC (D.Mass. July 15, 2011; Casper, U.S.D.J.), Durmic v. J.P. Morgan Chase Bank, NA, 10-CV-10380-RGS (D.Mass. Nov. 24, 2010; Steams, U.S.D.J.); and cases cited in the Markle opinion at 13.

As noted above. Indeed, the June, 2010 GAO report was critical of Treasury’s failure to “establish specific consequences or penalties for noncompliance with HAMP guidelines,” including “those related to treatment of borrowers.” GAO-10-634 at 27. Nine months later, the GAO reported that “little action has been taken to date” on its recommendations on this and other aspects of HAMP administration. GAO-11476T, p. 15.

Such clauses are common in, though not unique to, collective bargaining agreements. See, e.g., G.L.c. 149, §179C.

Evidently the plaintiff is not alone, nor are the issues outlined in her affidavit unique to these defendants. In a survey of HAMP housing counselors concerning their borrower clients’ experiences in the period June-November 2010, 76% rated their borrower clients’ experiences with the program as “negative” or “very negative.” The most commonly cited reason why borrowers contacted a housing counselor was lost paperwork. GAO-11-367R, “Results of Housing Counselors’ Survey on Borrowers’ Experiences with the Home Affordable Modification Program” (May 26, 2011), pp. 4-5, available at: http://www.gao.gov/new.items/dll367r.pdf.

Some courts which have denied borrowers third-party beneficiary status have nonetheless permitted a negligence claim to proceed. E.g., Speleos at 310-11 and Alpino at 10-11. Others have held that the absence of an enforceable contract duly meant that there was no duty of care. E.g., Markle at 15-18; Brown at 6-8; and Barrasso at 5-6. Having parted with the majority on the contract issue, I have the luxury of sidestepping this interesting tort issue.

It bears noting that even those courts which have denied third-party beneficiary contract claims have generally held that “a violation of the HAMP guidelines may nonetheless, in some circumstances, provide a basis for a claim under Chapter 93A.” Markle, slip op. at 18; accord, Blackwood; Alpino, slip op. at 10; Barrasso, slip op. at 6-9; Morris v. BAC Home Loans Servicing, L.P., 1:10-11572-PBS (D.Mass. April 12, 2011; Saris, U.S.D.J.); cf. Boyd v. U.S. Bank, N.A., 10 C 3367 (N.D.Ill. April 12, 2011; Feinerman, U.S.D.J.), slip op. at 5-10 (denying motion to dismiss as to claim under Illinois Consumer Fraud and Deceptive Business Practices Act).

See G.L.c. 93A(3) (“The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim . . .”).

Any accounting errors can, of course, be addressed under the contract count.

See, e.g., McManus, Doyle, “Americans Reluctant to Fund Bailout,” Los Angeles Times September 24, 2008, available at: http://articles.latimes.com/2008/sep/24/nation/na-econpoll24; N. Folbre, “Welfare for Bankers,” New York Times Economix Blog April 20, 2009, available at: http: //economix.blogs.nytimes.com/2009/04/20/welfare-for-bankers/.

For cases finding “outrageous” conduct (and a depressing catalog of man’s inhumanity to man), see, e.g., Bowman v. Heller, 420 Mass. 517, 522 n.6 (1995); Aegis v. Howard Johnson Co., 371 Mass. 140, 145 (1976); Bresnahan v. McAuliffe, 47 Mass.App.Ct. 278, 283 (1999); and Brown v. Nutter, McClennan & Fish, 45 Mass.App.Ct. 212, 213-14 (1998).