Salinger, Kenneth W., J.
Lydia Laguer brought this lawsuit to challenge the mortgage foreclosure sale of her home. The Court ALLOWS OneWest’s motion for summary judgment and DENIES Laguer’s motion to amend her complaint because: (1) Laguer’s loan is not subject to the Massachusetts Predatory Home Loan Practices Act, G.L.c. 183C, and in any case federal law governing federally-chartered savings banks would preempt application of c. 183C to Laguer’s loan; (2) OneWest holds Laguer’s mortgage and has standing to foreclose; (3) Laguer cannot bring suit to enforce directives issued by the United States Treasury Department regarding the federal Home Affordable Modification Program (HAMP); (4) a bank’s unfair or deceptive violation of HAMP directives may violate G.L.c. 93A, and federal law does not preempt Laguer’s claims under c. 93A; (5) however, Laguer’s claims under c. 93A nonetheless fail as a matter of law because the undisputed facts show that OneWest reasonably denied Laguer’s loan modification requests after Laguer repeatedly failed to provide material information, and that the terms of the Note were not so unfair as to violate G.L.c. 93A; and (6) Laguer’s proposed new claim that OneWest breached its HAMP contract with the federal government would be futile because Laguer has no right to enforce that contract and because OneWest reasonably denied Laguer’s modification requests.
1. Undisputed Material Facts
Laguer never responded to the statement of undisputed material facts that OneWest served with its motion for summary judgment. She did not do so in the manner required by Superior Court Rule 9A(b)(5). Nor did she file any admissible evidence that contradicts the facts relied upon by OneWest. The Court therefore deems the facts set forth in OneWest’s statement of facts to be undisputed for purposes of its motion for summary judgment. Cf. Dziamba v. Warner & Stackpole, 56 Mass.App.Ct. 397, 401 (2002).
As requested by Laguer at oral argument, the Court has also considered Laguer’s February 11, 2011, loan modification application-—a copy of which is attached to Laguer’s motion for leave to amend her complaint— to be part of Laguer’s summary judgment opposition. OneWest does not contest the authenticity of these documents or the fact that they were submitted to OneWest, and did not object to the Court considering them in deciding the summary judgment motion. Thus the Court considers that application and supporting documentation to be “proper parts of the summary judgment record” even though Laguer did not file an affidavit authenticating them. City of Boston v. Roxbury Action Program, Inc., 68 Mass.App.Ct. 468, 469 n.3, rev. denied, 449 Mass. 1101 (2007).
Laguer’s assertion that she questions some of the evidence submitted by OneWest does not create any disputed issue of material fact. “[M]ere assertions of the existence of disputed facts without evidentiary support cannot defeat [a] summary judgment motion.” Bergendahl v. Massachusetts Elec. Co., 45 Mass.App.Ct. 715, 718-19 (1998), cert. denied, 528 U.S. 929 (1999).
Although Laguer asks to conduct further discovery, she neither specified what additional discovery would be relevant nor explained why she could not have sought that information before. The period for completing discovery ended May 1, 2012. Laguer did not seek any further extension. Nor has she filed any affidavit explaining why she is unable to present “facts essential to justify [her] opposition” to the summary judgment motion, as required by Mass.R.Civ.P. 56(f). Laguer’s “failure to file the requisite affidavit is fatal” to her assertion that she should be allowed more time to rebut the undisputed evidence presented by OneW-est. See Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 458 (1997).
The following are undisputed facts or reasonable inferences drawn from those facts. In evaluating OneWest’s motion for summary judgment, the Court *16 “must . . . draw all reasonable inferences” from the evidence presented “in favor of the nonmoving parly,” as a jury or judicial fact finder would be free to do at trial. Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 119 (2010). It has done so.
a.Laguer’s Note and Mortgage
Laguer and her husband Amado R. Lopez bought a single-family home at 4 Judith Road in Chelmsford, Massachusetts (the “Property”) for $422,000 on or about February 2, 2006. They borrowed 80 percent of the purchase price from IndyMac Bank, F.S.B., a federally chartered savings bank, and executed a promissory note obligating them to repay IndyMac $337,600 plus interest over forty years (the “Note”). To secure this obligation, Laguer and Lopez gave Mortgage Electronic Registration System, Inc. (“MERS”) a mortgage on the Properly (the “Mortgage”). The Mortgage and quitclaim deed that conveyed the Property to Laguer and Lopez were recorded on February 3, 2006.
The Note had an initial, teaser interest rate of 2.5 percent per year. However, the interest rate could change every month beginning a mere two months after closing. The Note set that variable interest rate equal to three percentage points above the twelve-month average of the monthly yields on actively traded United States Treasury securities adjusted to a constant maturity of one year, subject to a ceiling of 9.95 percent annually. The Note also gave Laguer and Lopez the right to prepay any part or all of the principal without charge.
The amount that Laguer and her husband owed each month under the Note changed substantially during the time prior to their default. At the beginning of the loan term their required monthly payment was $1,113.33. The Federal Reserve Board reports that as of April 2006 the one-year constant maturity treasury rate was 4.90 percent, and that as of December 2008— the last month that Laguer or her husband made any payment—that rate index had fallen to 0.49 percent.[1] Thus, as of April 2006 the interest rate owed under the Note jumped from the teaser rate of 2.5 percent annually to the much higher rate of 7.90 percent, but by December 2008 it fell back to 3.49 percent.
Laguer has not provided any evidence of her and her husband’s combined income when they obtained their mortgage loan from IndyMac. Nor has she presented evidence of the fair market value of her home at the time she executed the Note other than the price that she and her husband paid for the Property.
b.Default, Assignment of Mortgage, and Foreclosure Notice
Laguer and Lopez have not made any payments under the Note since December 2008. IndyMac sent them a notice of default on January 31, 2009.
IndyMac had been closed by the federal Office of Thrift Supervision (“OTS”) on July 11, 2008, and the Federal Deposit Insurance Corporation was named Conservator. The FDIC sold substantially all of IndyMac’s assets and liabilities to OneWest Bank, F.S.B., on March 19, 2009.[2] Like IndyMac, OneWest is a federally chartered savings bank that is regulated by OTS.
MERS assigned the mortgage to OneWest a few months after OneWest acquired IndyMac’s assets and liabilities. This assignment was executed before a notary public on June 4, 2009, by Erica A. Johnson-Seck, who purported to be a Vice President of MERS. The assignment was recorded on June 30, 2009.
OneWest notified Laguer and Lopez in writing on July 8, 2010, that it intended to foreclose on the Mortgage because they had not cured their default. Laguer hired counsel to represent her regarding the foreclosure on July 19, 2010.
c.Loan Modification Requests
On July 27, 2010, Laguer’s counsel sent Laguer’s first request to modify the terms of the Note to IndyMac Mortgage Services, Inc., which is now a division of OneWest. Laguer estimated that at that time the Property had a fair market value of $379,168. She represented that she could no longer afford her monthly mortgage payments because her income “has diminished substantially” since the time that she and her husband signed the Note. Laguer also asserted that the Note violates G.L.c. 93A.
Laguer filed this action on September 3, 2010. OneWest rejected Laguer’s loan modification request on September 8, 2010, on the ground that a foreclosure sale was “imminent.” Nine days later, however, the court (Haggerty, J.) entered a preliminary injunction barring the foreclosure sale.
OneWest then agreed to consider Laguer’s request on the merits. In October 2010 it asked Laguer and Lopez to submit various documents to verify their income. Laguer submitted most of the requested documentation about her income, but did not submit any documentation regarding Lopez. On November 10, 2010, OneWest denied the loan modification request on the ground that Laguer did not provide all the documentation sought by OneWest. OneWest sent a second notice requesting the missing documentation on November 18, 2010. It again denied the loan modification on the ground that documentation was missing on December 6, 2010. On December 10, 2010, OneWest’s counsel wrote to Laguer’s counsel and said “a few remaining items ... are needed to complete the application” for a loan modification. OneWest asked for documentation that Laguer was receiving $1516 per month in child support, clarification of an IRA distribution shown on Laguer’s tax returns, a profit and loss statement for the past three months for the business income that Laguer had reported on her tax returns, and documentation of any pension income.
Laguer submitted a new application to OneWest for a loan modification on February 11, 2011. Laguer stated that she became delinquent on her mortgage loan *17 because she and her husband had separated, and asked OneWest to reduce the amount of her unpaid delinquency, reduce her monthly payment, or both. Laguer represented that her gross income was $6118 per month (i.e., $73,416 per year), including $4602 in monthly wages ($55,224 per year) plus $1516 in monthly child support ($18,192 per year). She also represented that her monthly expenses totaled $4,510, including $2,460 per month owed to OneWest under the Note, an additional $321 per month owed under a second mortgage loan, and $1,729 in other expenses. Thus, Laguer represented in February 2011 that the amount she owed OneWest each month under the Note equaled 40 percent of her monthly income. Laguer provided OneWest with copies of her last three pay stubs, pay stubs for Edith A. Lopez, copies of child support checks, bank account statements, a recent phone bill, and her state and federal income tax returns for 2009. Laguer’s pay stubs showed that as of January 2011 she was earning roughly $1,400 every two weeks, which equates to roughly $36,000 on an annual basis. That is substantially less than the wage income that Laguer had reported to OneWest in her loan modification application. On her 2009 tax returns Laguer reported earning wages of $33,530, which was also substantially less than the income she represented on her February 2011 mortgage loan modification request to OneWest. Those tax returns also included Schedules C and other documentation showing that Laguer had additional gross income of $5500 from an unidentified business, claimed roughly $14,400 in business-related expenses, and deducted a net business loss of almost $9,000 in calculating her taxable income.
On February 24, 2011, OneWest acknowledged receipt of this application and asked Laguer to submit a detailed profit and loss statement for the business reflected in her tax returns and a current IRS Form4506-T, which would authorize OneWest to obtain a federal income tax return transcript from the Internal Revenue Service. OneWest also asked Laguer to provide a “benefits statement or a letter from the benefits provider,” but did not explain what benefits it had in mind. OneWest wrote to Laguer again on March 14,2011. It again asked for the same items, and in addition asked Laguer to submit pay stubs documenting her income for the past month. After Laguer failed to respond, OneWest wrote to Laguer again on March 30, 2011, to reiterate its request. Laguer then sent in the requested IRS Form 4506-T. On April 12, 2011, OneWest wrote to Laguer asking again for her most recent pay stubs, and also asking for a copy of Laguer’s divorce decree, if any.
On May 31, 2011, OneWest informed her that it could not offer Laguer a loan modification because she had did not provide OneWest with the additional documentation it had requested.
Laguer then followed up by sending in more pay stubs; OneWest acknowledged receiving them in a letter dated June 15, 2011. However, OneWest again asked for Laguer’s divorce decree and now asked for copies of her most recent two months’ bank statements. OneWest reiterated this request on July 1, 2011. Six days later, on July 7, 2011, OneWest sent Laguer another request for a copy of her divorce decree. OneWest continued to ask Laguer for her most recent bank statements and divorce decree in repeated notices sent in July and August 2011. Laguer has not presented any evidence showing that she ever responded to these requests, either by providing OneW-est with the requested documentation or by providing any other kind of explanation.
Finally, OneWest informed Laguer on September 16, 2011, that it was denying her application because she did not provide the requested documentation.
2. G.L.c. 183C Is feither Not Implicated or Is Preempted
The Legislature has imposed constraints on the terms under which banks may extend credit through “high-cost home mortgage loans.” A loan secured by a mortgage on the borrower’s principal dwelling is a “high-cost” loan and thus subject to the Massachusetts Predatory Home Loan Practices Act if (1) it carries an annual interest rate that exceeds “the yield on United States Treasury securities having comparable periods of maturity by more than eight percentage points (or, in the case of loans secured by subordinate mortgages, nine percentage points), or (2) the total points and fees paid by the borrower to obtain the loan exceed five percent of the initial principal amount. See G.L.c. 183C, §2, definition of ’’High cost home mortgage loan."
The Note signed by Laguer was not subject to G.L.c. 183C. Because Laguer received an adjustable rate loan, one must look at “the interest rate that would be effective once the introductory rate has expired” to apply the first of these conditions. Id. As explained above, Laguer and her husband were paying an interest rate of 7.90 percent annually as of April 2006, when their two-month introductory rate expired. Since the rate itself was less than eight percent, it could not have exceeded the rate paid by the United States Treasury for bonds with a comparable maturity by more than eight percentage points. As for the second condition, Laguer did not allege in her complaint and has not presented any evidence showing that the points and fees that she and her husband paid for this loan exceeded five percent of their initial principal amount, i.e. $16,880. Nor has OneWest presented evidence showing that Laguer’s closing costs were less than or equal to this amount.
Even if G.L.c. 183C were implicated, that claim would be preempted by federal law.[3] Congress has given OTS broad authority to regulate federally-chartered savings banks like OneWest and IndyMac. See 12 U.S.C. §1462a(b)(2), §1463(a)(2), and §1464(a)(l). In exercising that authority OTS has stated that its regulations are intended to occupy the “entire field of lending regulation for federal savings associations.” 12 C.F.R. *18 §560.2(a).[4] OTS had the power to promulgate this regulation. Flagg v. Yonkers Sav. and Loan Ass’n, FA, 396 F.3d 178, 181-84 (2nd Cir.), cert. denied, 546 U.S. 817 (2005); see generally R.J. Reynolds Tobacco Co. v. Durham County, North Carolina, 479 U.S. 130, 148 (1986) (“where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute,... as part of the preemption analysis we must consider whether the regulations evidence a desire to occupy a field completely”). Although OTS says that it is occupying the field, in practice it has actually established a form of conflict preemption by providing that state laws are not preempted by OTS regulations “to the extent that [i] they only incidentally affect the lending operations of Federal savings associations or [ii] are otherwise consistent with the purposes of’ federal laws governing the granting of credit by federal savings banks. Id, §560.2(c). Nonetheless, the provisions of G.L.c. 183C that Laguer invokes here are preempted because they regulate “(t]he terms of credit” that such lenders may offer and the “(l]oan-related fees” they may charge. See 12 C.F.R. §560.2(b)(4) & (5).
3.OneWest Has Standing to Foreclose
OneWest has the legal right to enforce the Mortgage and to conduct a foreclosure sale on the Property. As noted above, it is undisputed that an assignment of the Mortgage to OneWest was executed before a notary public on June 4, 2009, by Erica A. Johnson-Seck, who was purporting to be a Vice President of MERS, the entity then holding the Mortgage. Such an assignment “shall be binding upon” the entity then holding the mortgage, meaning MERS in this case, “and shall be entitled to be recorded, and no vote of the entity affirming such authority shall be required to permit recording.” G.L.c. 183, §54B. Since this assignment on its face binds MERS as a matter of law, Laguer may not challenge the validity of this assignment on the theory that Ms. Johnson-Seck lacked actual authority to assign the Mortgage.
Nor may Laguer challenge the foreclosure sale on the ground that only a mortgagee that also holds the underlying note may conduct such a sale in Massachusetts. Although the Supreme Judicial Court has now construed G.L.C. 183, §21, and G.L.c. 244, §14, to provide that a mortgagee may not foreclose unless it also holds the note underlying the mortgage, this interpretation and thus this requirement “appl(ies) only to mortgage foreclosure sales for which the mandatory notice of sale has been given after” June 22,2012. See Eaton v. Federal Nat’l Mortgage Ass’n, 462 Mass. 569, 589 (2012). It is undisputed that Laguer received written notice of OneWest’s notice of intention to foreclose and sell the Property in July 2010, almost two years before the new statutory interpretation announced in Eaton took effect. In any case, the Note was assigned to OneWest as part of its purchase of the assets and liabilities of IndyMac. Thus, OneWest would be entitled to foreclose even if Eaton applied here, which it does not.
4.Plaintiff Has No Private Right of Action to Enforce HAMP Directives
“Congress created HAMP through the Emergency Economic Stabilization Act of 2008 (the “EESA”), 12 U.S.C. §§5201 et seq.” Freitas v. Wells Fargo Home Mrtg., Inc., 703 F.3d 436, 437 n.2 (8th Cir. 2013).
The goal of HAMP is to provide relief to borrowers who have defaulted or are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt. See U.S. Dep’t of the Treasury, Supplemental Directive 09-01, available at https://www.hmpadmin.com/portal/pro-grams/docs/hamp_servicer/sd0901 .pdf. Under HAMP, loan servicers are provided with incentive payments for each permanent mortgage-loan modification completed. Id, at 23. These modifications proceed under a uniform process designed to identify eligible borrowers and render their debt obligations more affordable and sustainable. Id, at 1.
Fayette v. Bank of America, N.A., No. 12cv11172-FDS, 2012 WL 5389927, *1 n.5 (D.Mass. 2012) (Saylor, J.).
To the extent that Laguer claims that OneWest has violated the Treasury Department’s HAMP directives, that claim fails as a matter of law because there is no private right to enforce those directives. A regulation, or a sub-regulatory directive like those promulgated by the Treasury Department to implement HAMP, cannot create any private right of action where Congress did not intend that the statute authorizing the rule would create any such private remedy. Alexander v. Sandoval, 532 U.S. 275, 291 (2001) (“Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. . . Agencies may play the sorcerer’s apprentice but not the sorcerer himself’); accord Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 545-46 (1998). But nothing in the EESA suggests that Congress intended to create a privately enforceable loan modification remedy. See Miller v. Chase Home Finance, LLC, 677 F.3d 1113, 1116 (11th Cir. 2012). There is no private right of action to enforce an underlying federal statute unless “the statute manifests an intent to create not just a private right but also a private remedy” (emphasis in original). Gonzaga University v. Doe, 536 U.S. 273, 284 (2002), quoting Alexander, 532 U.S. at 286. The EESA does not manifest any such intent as to HAMP.
5.Laguer’s Claims Under G.L.c. 93A Are Not Preempted
Laguer claims that OneWest violated G.L.c. 93Ain two ways. First, she asserts that OneWest’s predecessor in interest IndyMac unfairly made a loan secured by a mortgage on her home “in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.” Cf. Commonwealth v. Fremont Investment & Loan, 452 Mass. 733, 749 (2008). Second, she asserts that by refusing to modify the terms of her loan OneWest *19 has violated the HAMP guidelines in a manner that is so unfair as to violate c. 93A. The mere fact that Congress did not create a federal private right of action for violating HAMP “provides no reason to dismiss a claim under” c. 93A “just because it refers to or incorporates some element of the federal law.” Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 581 (7th Cir. 2012) (same as to claim that failure to follow HAMP guidelines violated Illinois Consumer Fraud and Deceptive Business Act).
Neither of these claims under c. 93A is preempted by the OTS preemption rule discussed above. State “(c]ontract and commercial law[s]” are “not preempted to the extent that they [i] only incidentally affect the lending operations of Federal savings associations or [ii] are otherwise consistent with the purposes” of federal laws governing loans made by federal savings banks. 12 C.F.R. §560.2(c)(l).
Both prongs of this savings clause apply to Laguer’s claims under c. 93A. The Massachusetts Consumer Protection Act “prohibits ‘unfair or deceptive practices in the conduct of any trade or commerce.’ ” Feeney v. Dell Inc., 454 Mass. 192, 212 (2009), quoting G.L.c. 93A, §2(a). As a general commercial law that only incidentally affects home mortgage loans, c. 93A is not preempted by the OTS rule, except to the extent that a party claims that c. 93A imposes specific requirements on the terms of credit offerings by federal savings banks. See Sovereign Bank v. Sturgis, 863 F.Sup.2d 75, 96-98 (D.Mass. 2012) (Woodlock, J.); see also McCurry v. Chevy Chase Bank, FSB, 169 Wash.2d 96, 103-07, 233 P.3d 861, 864-66 (2010) (en banc) (same re Washington Consumer Protection Act); Binetti v. Washington Mut. Bank, 446 F.Sup.2d 217, 220-21 (S.D.N.Y. 2006) (McMahon, J.) (same re New York Consumer Fraud Statute).
Furthermore, Laguer’s claims under c. 93A are consistent with applicable federal law. OneWest points to no federal statute, regulation, or guideline that encourages or allows federal savings banks to make home mortgage loans with the expectation that the borrower will default and the lender will gain the right to foreclose on the borrower’s home. Similarly, “[a]llowing homeowners threatened with foreclosure to recover damages under Chapter 93A” for “a violation of HAMP that is deceptive or unfair” is “compatible with” the objectives of HAMP. Morris v. BAC Home Loans Servicing, L.P., 775 F.2d 255, 259 (D.Mass. 2011) (Saris, J.); accord Wigod, 673 F.3d at 578-81.
6. Laguer’s Claims Under G.L.c. 93A Fail as a Matter of Law
Although Laguer’s c. 93A claims are not preempted, OneWest is nonetheless entitled to judgment in its favor on those claims.
a. The Loan Was Not Doomed to Foreclosure
Laguer’s claim that her mortgage loan was “doomed to foreclosure” because it has all four of the characteristics that were held to be unfair and to violate c. 93A in Fremont Investment, 452 Mass. at 739, cannot be squared with the undisputed facts.
Laguer’s loan does have the first two Fremont characteristics: it is an adjustable rate mortgage with an introductory rate that was in place for only two months (and thus far less than three years), and the introductory annual interest rate of 2.5 percent was more than three percentage points below the initial fully-indexed rate of 7.90 percent.
However, Laguer presents no evidence that the other Fremont characteristics were present here. There is no factual basis for Laguer’s assertion at oral argument that the debt-to-income ratio of the amount borrowed by Laguer and her husband to their joint gross income exceeded fifty percent. Laguer and her husband were joint borrowers on the Note. But Laguer submitted no evidence regarding her husband’s income. For that matter she presented no evidence as to Laguer’s own income in early 2006 when she signed the Note. However, Laguer repeatedly told OneWest in her loan modification requests that the reason she ran into trouble in repaying the Note is that she and her husband, separated. It is reasonable to infer from Laguer’s own statements to OneWest that when she and her husband were both repaying the Note their joint income was adequate to remain current on their obligations. Furthermore, the loan-to-value ratio at the time they executed the Note was 80 percent, as Laguer and her husband paid 20 percent of the Property’s purchase price from other funds, and the Note provided that Laguer and her husband could prepay the Note at any time without any penalty or charge. Thus, unlike in Fremont, One-West had no reason to expect that Laguer and her husband could not refinance their loan if they could get better terms from another lender.
The available factual record is consistent with Laguer’s statements to OneWest that she only began having trouble repaying the Note because at some point Laguer and her husband separated and he stopped paying Laguer anything other than child support. The undisputed facts rebut Laguer’s claim that IndyMac set her up for failure by lending her too much money unsupported by enough income and sufficient home equity. To the contrary, it appears that Laguer and her husband had sufficient income to make payments on the Note even when the interest rate adjusted upwards, and that even after housing prices fell the amount owed by Laguer under the Note was still substantially less than the market value of the home. In sum, this loan does not share the characteristics that were identified in Fremont as ones that a lender should know would make it impossible for a borrower to repay the loan without refinancing, while simulta *20 neously making it impossible to refinance. Cf. Fremont Investment, 452 Mass. at 739-40.
b. Laguer Failed to Provide Material Information
Laguer’s separate claim that OneWest unfairly refused to modify her loan terms, in violation of HAMP as well as of c. 93A, fares no better. It was reasonable for OneWest to decline to modify the terms of the Note after Laguer failed to provide material information and documentation notwithstanding OneWest’s repeated requests for it.
Under Treasury Department’s guidelines, borrowers are not eligible for a HAMP modification of their residential mortgage loan unless they “meet certain threshold requirements, including that the loan originated on or before January 1,2009; it was secured by the borrower’s primary residence; the mortgage payments were more than 31 "percent of the borrower’s monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750.” Wigod, 673 F.3d at 556; see also Treasury Dept. Supp’l Directive 09-01.[5] Borrowers seeking a loan modification must also document that they have experienced some hardship, which may include “[a] reduction in or loss of income that was supporting the mortgage,” that prevents them from paying their loan under the current loan terms. Supp’l Directive 09-01, pp. 2-3.
Since June 1, 2010, mortgage loan servicers may only offer a borrower a loan modification under HAMP ‘based on verified income documentation.” Lucia v. Wells Fargo Bank, N.A., 798 F.Sup.2d 1059, 1070 (N.D.Cal. 2011), quoting Treasury Dept. Supp’l Directive 10-01, p.1 (available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd 1001.pdf). This requirement applies to Laguer, as she made her first loan modification request in July 2010. Borrowers who report self-employment income must provide their most recent quarterly or annual profit and loss statement. Supp’l Directive 10-01, p. 4. Borrowers who report child support income must provide “copies of the divorce decree, separation agreement or other legal written agreement filed with a court” that establishes or documents the child support arrangement. Id. p. 5. If a servicer needs additional documentation to verify an applicant’s income, it must ask for the additional documents at least twice in writing. Id. p.3.
The Treasury Department has provided that “(i]f a borrower is unresponsive to these requests for documentation the servicer may discontinue document collection efforts and determine the borrower to be ineligible for HAMP.” Id.
It was not unfair, and did not violate c. 93A or the HAMP guidelines, for OneWest to deny Laguer’s loan modification requests after Laguer failed to respond to repeated requests by OneWest for additional information and documentation needed to verify the income available to meet Laguer’s loan obligations. It was reasonable for OneWest to ask for a copy of Laguer’s divorce decree because (1) Laguer and her husband were jointly liable on the Note, but Laguer informed OneWest that they had separated and that only Laguer’s income was available to repay the Note going forward, and (2) Laguer reported child support income to OneWest. Yet Laguer has proffered no evidence that she provided OneWest either with a copy of a divorce decree or a clear explanation of her personal circumstances. Without this information, OneWest was left with .no way to verify that the income of Lopez’s husband in excess of the reported child support payments was no longer available to support the mortgage loan, and was unable to verify Laguer’s child support income. Furthermore, Laguer’s representation that she had an income of roughly $55,000 per year excluding child support was not supported by the documentation that Laguer provided to OneWest. Her paystubs and 2009 income tax returns indicated that she had taxable wages of $33,500 to $36,000 per year, and that she has had an unidentified business that produced a net loss. It was therefore reasonable for OneWest to ask Laguer for copies of her bank account statements and for a profit-and-Ioss statement to document her business income. Laguer presented no evidence that she responded to these repeated requests.
7. The Motion to Amend to Add a HAMP Contract Claim Is Futile
Laguer responded to OneWest’s motion for summary judgment in part by filing a cross motion to amend her complaint. Laguer wishes to add a new claim that One-West entered into a Servicer Participation Agreement (“SPA”) with the United States Treasury Department (although perhaps Laguer meant to say that OneWest entered into an SPA with the Federal National Mortgage Association, known colloquially as Fannie Mae),[6] that the SPA requires OneWest to comply with all HAMP directives, and that OneWest breached the HAMP directives and thus breached its SPA by denying Laguer’s February 11, 2011, request for a loan modification. Laguer did not submit a proposed amended complaint or provide a copy of the SPA signed by OneWest.[7]
The Court has considered Laguer’s motion to amend on the merits, even though it was filed almost 21 months after the tracking order’s deadline for seeking to amend a pleading. It would be unfair to allow OneWest to foreclose on Laguer’s home without considering whether Laguer has a viable new claim that the planned foreclosure is unlawful. In contrast, OneW-est would suffer no unfair prejudice if Laguer were allowed to add her new contract claim at this time. Furthermore, OneWest is quite cheeky to argue that it is too late for Laguer to seek to amend her complaint, where OneWest raised its new preemption defense for the first time at oral argument on the two pending motions. OneWest’s assertion that federal law preempts Laguer’s claims does not present an issue of subject matter jurisdiction that may be raised at any time but instead “is a waivable affirmative defense,” as OneWest makes no claim that Congress gave the federal courts or a federal agency exclusive jurisdiction to decide the matter. *21 See Central Transport, Inc. v. Package Printing Co., Inc., 429 Mass. 189, 191-93 (1999).
As explained below, however, Laguer’s motion to amend is DENIED because the proposed amendment would be futile. See Johnston v. Box, 453 Mass. 569, 583 (2009) (“Courts are not required to grant motions to amend prior complaints where ‘the proposed amendment... is futile’ ” (quoting All Seasons Servs., Inc. v. Commissioner of Health & Hosps. of Boston, 416 Mass. 269, 272 (1993)).
a. Laguer Cannot Enforce the Treasury Department’s Contract with OneWest
Laguer cannot enforce OneWest’s contractual obligations under its SPA with the United States Treasury Department or its agent unless Laguer is an intended beneficiary of that contract. “Under Massachusetts law, only intended beneficiaries, not incidental beneficiaries, can enforce a contract.” See Harvard Law School Coalition for Civil Rights v. President and Fellows of Harvard College, 413 Mass. 66, 71 (1992). The same is true under federal common law, which governs the enforceability of a contract with the federal government or its agent. See, e.g., Astra USA, Inc. v. Santa Clara County, California, 131 S.Ct. 1342, 1347-48 (2011); GECCMC 2005-C1 Plummer Street Office Ltd. Partnership v. JPMorgan Chase Bank, Nat. Ass’n, 671 F.3d 1027, 1033 (9th Cir. 2012). “Federal law controls the interpretation of the HAMP contract because one party to that contract is the United States.” Speleos v. BAC Home Loans Servicing, L.P., 755 F.Sup.2d 304, 307 (D.Mass. 2010) (Gorton, J.).
A third party who may benefit from promises made in someone else’s contract is an “intended beneficiary” of that contract only if the promisor and promisee intended that the third party benefit from the contract and be able to enforce a party’s contractual obligations. See The James Family Charitable Foundation v. State Street Bank and Trust Co., 80 Mass.App.Ct. 720, 724 (2011). “[I]fthe beneficiary would be reasonable in relying on the promise as manifesting an intent to confer a right on him [to enforce the promise], he is an intended beneficiary” (brackets and bracketed language in original). Rae v. Air-Speed, Inc., 386 Mass. 187, 195 n.3 (1982) (quoting Restatement §302, comment d).
“Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary.” Teixeira v. Federal National Mortgage Ass’n, no. 10-civ-11649-GAO, 2011 WL 3101811, *2 (D.Mass. 2011) (O'Toole, J.), quoting Klamath Water Users Protective Ass’n v. Patterson, 204 F.3d 1206, 1212 (9th Cir. 1999), cert. denied sub nom. Klamath Drainage Dist. v. Patterson, 531 U.S. 812 (2000) (individual homeowner not intended beneficiary HAMP SPA). Thus, “as a general proposition, public citizens are not intended third-party beneficiaries to government contracts despite the fact that such contracts are usually intended to benefit the public in some way.” Speleos, 755 F.Sup.2d at 310 (same); accord Restatement (Second) Contracts §313, comment a (1981) (“Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested”). “[B]ecause of ‘the complications that would ensue from private enforcement of government contracts by members of the general public,’ courts require a showing that the parties clearly intended that third parties be permitted to enforce the contract.” Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 834 (Minn. 2012), quoting Edwards v. Aurora Loan Servs., LLC, 791 F.Sup.2d 144, 151 (D.D.C. 2011); accord 9 J. Murray, Corbin on Contracts §45.6 (rev. ed. 2007) (‘The distinction between an intention to benefit a third parly and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity”).
Here, Laguer says that she seeks to enforce a contractual promise by OneWest to comply with the obligations set forth in the Treasury Department’s HAMP directives. But a contract with a federal agency or its representative that merely incorporates legal obligations imposed by a federal statute or program is not enforceable by a contract beneficiary who has no private right of action to enforce the. underlying statute or program. See Astra, 131 S.Ct. at 1347-49. As discussed above, Laguer has no private right of action to enforce the HAMP directives directly, because as a matter of law the Department or its agents cannot create a private right of action to enforce federal law where Congress did not intend to create private remedy in the underlying statute. Thus, under the rule of law established by Astra Laguer is not an intended beneficiary of and has no right to enforce any contractual promise by OneWest to the Treasury Department’s agent to comply with the same HAMP directives. See id.; Wigod, 673 F.3d at 559 n.4 (“since Astra district courts have correctly applied the Court’s decision to foreclose claims by homeowners seeking HAMP modifications as third-party beneficiaries of SPAs”). The Court respectfully disagrees with Parker v. Bank of America, NA, No. MICV2011-01838, 29 Mass. L. Rptr. 194, 2011 WL 6413615, *4-*10 (Mass. Superior Ct. 2011) (Billings, J.), and instead agrees with the majority consensus that individual borrowers have no contractual right to enforce HAMP obligations incorporated into an SPA between a bank and the federal government. See, e.g., cases cited in Teixeira and Parker.
b. OneWest Complied with HAMP
Laguer’s motion to amend her complaint would be futile even if she were an intended beneficiary entitled to enforce OneWest’s SPA As discussed above, the undisputed documentary record demonstrates that OneWest denied Laguer’s loan modification agreement because Laguer failed to respond to repeated requests for material information, and thus OneWest’s denial is consistent with and expressly permitted by HAMP Supplemental Directive 10-01. Laguer’s motion to amend identifies no facts plausibly suggesting that OneWest lacked a good faith basis for *22 denying Laguer’s loan modification request. Since the proposed amendment could not survive a motion to dismiss, allowing it would be an exercise in futility. Mancuso v. Kinchla, 60 Mass.App.Ct. 558, 572 (2004).
ORDER
Defendant’s motion for summary judgment is AD-LOWED, and Plaintiffs cross motion for leave to amend her complaint is DENIED.

See http://www.federalreserve.gov/releases/h15/data.htm (file available under “Treasury constant maturities,” “1-year” at the “Monthly" link). The Court takes judicial notice of these facts, as they are “capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned.” Mass. Guide Evid: §201(b)(2); accord Katz v. Katz, 55 Mass.App.Ct. 472, 474 n.1, rev. denied, 437 Mass. 1111 (2002) (taking judicial notice of Federal Reserve Board publication regarding interest rates): see also Bostwick v. Hurstel, 364 Mass. 282, 293 n.3 (1973) (taking judicial notice of AT&T stock prices based on “sources recognized as authoritative”).

he failure and closure of IndyMac, the subsequent sale of IndyMac’s assets and liabilities to OneWest, and the assignment to and acquisition by OneWest of all loans and mortgages previously owned by IndyMac are recounted at the FDIC’s website. See www.fdic.gov/bank/individ-ual/failed/IndyMac.html. The contract under which the FDIC sold and OneWest acquired the assets and liabilities of IndyMac provides that all loans and mortgages previously owned by IndyMac were assigned to and acquired by OneW-est. Article 3.1(d) of that Purchase and Assumption Agreement provides for the assignment and acquisition of all “Loans,” which is defined in Article I to include “all Liens,” which in turn is defined to include “any mortgage.” See www.fdic.gov/bank/individual/failed/IndyMac_P_and_A.pdf. The Court takes judicial notice of tírese facts under Mass. Guide Evid. §201(b) (2).

OneWest asserted that Laguer’s state law claims are preempted for the first time at oral argument. Laguer lodged no objection and did not seek leave to file any response to this new argument.

In contrast, the Office of the Comptroller of the Currency, which regulates federally-chartered banks other than savings banks, “has explicitly avoided full field preemption in its rulemaking and has not been granted full field preemption by Congress.” Epps v. JP Morgan Chase Bank, N.A., 675 F.3d 315, 323 (4th Cir. 2012), quoting Aguayo v. U.S. Bank, 653 F.3d 912, 921-22 (9th Cir. 2011).

The Court takes judicial notice of the Treasury Department’s HAMP directives as they are public records the contents of which are undisputed. See Mass. Guide Evid. §201(b)(2); Wigod, 673 F.3d at 556-57 (taking notice of HAMP directives on ground that “public documents and reports of administrative bodies that are proper subjects for judicial notice”); Anzalone v. Administrative Office of the Trial Court, 457 Mass. 647, 659 (2010) (taking notice of facts in public reports).

“Under HAMP, individual loan servicers voluntarily enter into contracts with Fannie Mae, acting as the financial agent of the United States, to perform loan modification services in exchange for certain financial incentives.” Nevada v. Bank of America, Corp., 627 F.2d 661, 665 n.1 (9th Cir. 2012), quoting Newell v. Wells Fargo Bank, N.A., 2012 WL 27783, at *1 (N.D.Cal. Jan. 5, 2012).

The standard SPA form is available at https: //www.hmpadmin.com/portal/programs/docs/ham p servicer/servicerparticipationagreement.pdf.